SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
THOMAS R. KAUFMAN, Cal. Bar No. 177936
tkaufman@sheppardmullin.com
RACHEL P. HOWARD, Cal. Bar No. 273968
rhoward@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone: 310.228.3700
Facsimile: 310.228.3701

Attorneys for Defendant
WELLS FARGO BANK, N.A.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIROSLAVA DE PAZ individual, | Case No. 2:18-cv-09779-PSG-PJW |
| Plaintiff, | Assigned to Hon. Philip Gutierrez |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| WELLS FARGO BANK, N.A., and DOES 1 through 100, inclusive | |
| Defendants. | *[Filed concurrently with Notice of Motion for Partial Summary Judgment; Statement of Undisputed Facts and Statement of Genuine Issues; Appendix of Evidence; and [Proposed] Order]* |
| | DATE:        October 28, 2019<br>TIME:         1:30 PM<br>CRTRM:      6A |
| | Complaint Filed: October 25, 2018 |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

II.   SUMMARY OF RELEVANT FACTS .................................................................... 3

    A.   Plaintiff and The Nature of Her Business Banking Specialist Job At Wells Fargo ............................................................................................................ 3

    B.   Plaintiff's Co-Workers and Managers During The Last Several Years of Her Employment at Wells Fargo ............................................................. 4

    C.   The Company Handbook, Code of Ethics, and Wells Fargo's Many Avenues to Lodge Workplace Complaints ...................................................... 5

    D.   Plaintiff Was Aware That Falsifying Documents Could Lead To Discharge ............................................................................................................ 5

    E.   Plaintiff Was Trained on the Importance of Witnessing The Signing of Loan Documents and the Signs of Elder Abuse ......................................... 6

    F.   The May 25, 2017 Incident That Led to Plaintiff's Eventual Discharge ...... 7

    G.   Wells Fargo Learns of The May 25, 2017 Incident In September 2017 When the Credit Connections Department Called Ms. C Regarding the Account's Lack of Activity ...................................................................... 9

    H.   Wells Fargo Assigns a Corporate Investigator To Investigate the May 25, 2017 Incident ...................................................................................... 10

    I.   Based on the Investigator's Recommendation, Wells Fargo Terminates Plaintiff's Employment for Falsification of Documents .......... 11

    J.   Plaintiff Has Only Speculation to Support Her View That Her Termination Was Motivated By Age Discrimination ................................. 12

    K.   Plaintiff Released Any Wage And Hour Claims She Had Arising On or Before November 8, 2017 ........................................................................ 13

    L.   Plaintiff Submitted a Boilerplate Letter to the LWDA Attempting to Exhaust Administrative Remedies for a PAGA Claim ............................... 14

III.   LEGAL ARGUMENT ........................................................................................ 14

    A.   Plaintiff's Sixth Cause of Action for Age Discrimination Fails as a Matter of Law Because She Lacks Evidence That Wells Fargo's Proffered Reason For Dismissing Her Was a Pretext for Age Discrimination ...................................................................................................... 14

    B.   Plaintiff's Claim for Punitive Damages Fails as a Matter of Law Because She Lacks Admissible Evidence of Malicious, Oppressive or Fraudulent Misconduct by a Wells Fargo Officer, Director or Managing Agent ......................................................................................... 16

C.    Plaintiff's Ninth Cause of Action Is Barred for Failure to Properly
      Exhaust the PAGA Administrative Remedy ................................................ 17

D.    Plaintiff's First Through Fifth, Seventh and Eighth Causes of Action
      Are Barred to The Extent They Arise on or Before November 8, 2017
      Because She Released Them Through Her Participation in a Class
      Settlement ..................................................................................................... 20

IV.   CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Ackerman v. Western Electric Co.*
  643 F. Supp. 836 (N.D. Cal. 1986), *aff'd*, 860 F. 2d 1514 (9th Cir. 1988) ................... 16

*Alcantar v. Hobart Service, et al.*
  800 F.3d 1047 (9th Cir. 2015) ....................................................................... 18, 19

*Chie v. Reed Elsevier, Inc.*
  2011 WL 3879495 (N.D. Cal. Sept. 2, 2011) ..................................................... 20

*Holak v. K Mart Corp.*
  2015 WL 2384895 (E.D. Cal. May 19, 2015) .................................................... 19

*Machado v. M.A.T. & Sons Landscape, Inc.*
  2009 WL 2230788 (E.D. Cal. July 23, 2009) ..................................................... 20

*Sinohui v. CEC Entm't, Inc.*
  2016 WL 3406383 (C.D. Cal. June 14, 2016) .................................................... 19

**State Cases**

*Aquino v. Superior Court*
  21 Cal. App. 4th 847 (1993) .......................................................................... 16

*Artega v. Brink's, Inc.*
  163 Cal. App. 4th 327 (2008) ........................................................................ 16

*Basich v. Allstate Ins. Co.*
  87 Cal. App. 4th 1112 (2001) ........................................................................ 16

*Caliber Bodyworks, Inc. v. Superior Court*
  134 Cal. App. 4th 365 (2005) .................................................................... 17, 18

*College Hospital Inc. v. Superior Court*
  8 Cal. 4th 704 (1994) .................................................................................. 17

*Guz v. Bechtel Nat. Inc.*
  24 Cal.4th 317 (2000) .............................................................................. 14, 15

*Hersant v. Dept. of Soc. Servs.*
  57 Cal. App. 4th 997 (1997) .......................................................................... 15

*King v. United Parcel Svc.*
  152 Cal. App. 4th 426 (2007) ........................................................................ 15

-iv-

*Martin v. Lockheed Missiles & Space Co., Inc.*
   29 Cal. App. 4th 1718 (1994) ........................................................................ 14

*Villacres v. ABM Industries Inc.*
   189 Cal. App. 4th 562 (2010) ........................................................................ 20

-v-

1    **I.**      <u>**INTRODUCTION AND SUMMARY OF ARGUMENT**</u>

2         Wells Fargo files this motion for partial summary judgment directed at

3 Plaintiff's claim for age discrimination, for punitive damages, for violation of the

4 Labor Code Private Attorney General Act ("PAGA"), and for all of her wage and

5 hour claims to the extent they are barred by a class settlement in another action.

6         Plaintiff worked as a Business Banking Specialist for Wells Fargo in its

7 Covina branch. Wells Fargo terminated her employment in January 2018 because

8 she falsified a credit line application. More specifically, the account owner was a

9 93-year-old woman in a nursing home, Lorraine C,[1] and Plaintiff improperly

10 allowed Ms. C's son to take a paper credit application out of the bank and return

11 with what he contended was Ms. C's signature without verification. Plaintiff did not

12 witness the signature nor did she telephone Ms. C to confirm her consent, yet she

13 accepted the application. In fact, she falsely indicated that Ms. C was in the bank as

14 part of the process of generating the paper application. Plaintiff admits that her

15 actions violated both the Wells Fargo handbook and its Code of Ethics.

16         The matter came to Wells Fargo's attention several months later when the

17 lack of activity on the new account triggered a  call from Wells Fargo's Credit

18 Connections department to confirm the account was genuine. The Wells Fargo

19 employee requested to talk with Ms. C as the account holder on the account. When

20 customer service interviewed Ms. C, she appeared disoriented and not to understand

21 what the account was. Furthermore, the Wells Fargo employee could hear Craig C

22 in the background telling Ms. C what to say. Accordingly, the matter was referred

23 for investigation of potential elder abuse. Eventually, a corporate investigator who

24 did not know Plaintiff interviewed her and when Plaintiff admitted she had allowed

25 Craig C to take a paper application out of the bank and bring it back "signed"

26 _____

27       [1]       The parties have agreed to truncate Dr. C and Lorraine C's last names

28 to protect their customer privacy.

without Plaintiff observing Ms. C sign it or speaking to Ms. C, the investigator recommended terminating Plaintiff's employment for falsification. The district manager approved the investigator's recommendation.

Wells Fargo is entitled to partial summary judgment on the age discrimination claim because Plaintiff has no evidence that the reason Wells Fargo gave for terminating her employment—her admitted falsification of a credit line application—was a pretext for age discrimination. She has no evidence that anyone involved in discovering her misconduct, reporting it, or investigating it had any animus against her because of her age. Furthermore, she admits that her violation is the type that leads to discharge. Accordingly, the claim fails as a matter of law.

Similarly, Plaintiff's claim for punitive damages, which is entirely derivative of her age claim, fails as a matter of law. She lacks any evidence that a Wells Fargo officer, director, or managing agent engaged in malicious, oppressive or fraudulent conduct against her. The only management employee in any way involved in the termination decision, the District Manager, was presented with a recommendation from an investigator to terminate an employee for admitted misconduct that may have enabled elder abuse of a Wells Fargo customer. There is nothing malicious, oppressive, or fraudulent about concluding that the investigator's recommendation should be followed. As such, the Court should dismiss the punitive damages claim.

Wells Fargo is also entitled to partial summary judgment on Plaintiff's PAGA claim. In December of 2018, Plaintiff sent a letter to the Labor Workforce Development Agency ("LWDA") to exhaust administrative remedies for a PAGA claim. However, her letter fails to identify a universe of "aggrieved employees" and fails to set forth anything other than boilerplate statements and legal conclusions. Under controlling circuit precedent, this letter failed to set forth sufficient "facts and theories" to exhaust administrative remedies for a PAGA claim.

Finally, Plaintiff's individual wage and hour claims are all barred to the extent they are based on conduct occurring on or before November 8, 2017 because

-2-

Plaintiff released those claims through her participation in a class settlement. Accordingly, Wells Fargo requests a formal order granting partial summary judgment for claims arising in that settlement period.

For all the foregoing reasons, Wells Fargo respectfully requests that the Court grant its motion for partial summary judgment.

## II.   SUMMARY OF RELEVANT FACTS

### A.   Plaintiff and The Nature of Her Business Banking Specialist Job At Wells Fargo

Plaintiff's birthdate is July 27, 1957.[2]  She began working at Crocker National Bank in approximately 1980 as a customer service worker in the loan department.[3] As a result of various mergers and acquisitions involving Crocker, Wells Fargo and other entities, by approximately 1991 Plaintiff was a Wells Fargo employee.[4]

Between 2003 and the end of her employment in 2018, Plaintiff worked for Wells Fargo in the position of Business Banking Specialist.[5]  Her basic job duties were set forth in a job description that she agrees accurately described her job duties.[6]  The job description identified her duties as including: (1) providing service to small business customers; (2) proactively engaging in activities to acquire new customers; (3) conducting outbound calls to meet customers' needs; and (4) offering and negotiating applications for certain financial products and services.[7]

Before 2015, Plaintiff found her job to be high pressure because of what she

---

[2]      Plaintiff's Deposition ("Pltf. Dep.") 108:19-25.

[3]      Pltf. Dep. 16:22-17:21.

[4]      Pltf. Dep. 17:22-18:12.

[5]      Pltf. Dep. 18:23-19:21, 20:6-9.

[6]      Pltf. Dep. 75:23-76:11; Ex. B-9.  All references to exhibits are to like-numbered exhibits within the concurrently filed Appendix of Evidence.

[7]      Pltf. Dep. 76:24-78:25; Ex. B-9.

viewed as Wells Fargo setting and enforcing difficult sales goals.[8]  In 2015, however, Wells Fargo eliminated the sales goals, which reduced this pressure.[9]

### B.    Plaintiff's Co-Workers and Managers During The Last Several Years of Her Employment at Wells Fargo

For the last year and one-half of Plaintiff's employment (between mid-2016 and early 2018), her manager was Sandra Sandoval.[10]  During that period, Plaintiff's co-workers included Dallas Arviso (Personal Banker), Tracy Cortez (Personal Banker), Carmena Suarez (Personal Banker), Leo Villegrana (Personal Banker), David Cherbak (Personal Banker II), Rosalia Munoz (Personal Banker II), and Sherry Solorzano (Private Banker).[11]  At the end of Plaintiff's employment, Rosalia Munoz,  David Cherbak, and Sandra Sandoval were all over 50 years old.[12]

Plaintiff contends that unspecified branch managers had sometimes referred to her and Ms. Munoz, who had worked for the bank for more than 20 years, as "seniors."[13]  Plaintiff was unsure whether this was a reference to their age, their long experience at the bank, or both.[14]

Plaintiff believes that a previous manager from years earlier, Melba, wanted to terminate Plaintiff in 2013 for low sales numbers, but no other manager had since tried to discharge her.[15]  Back in 2015, another former manager once mentioned to Plaintiff that he was disappointed that her sales numbers were not higher given her

---

[8]      Pltf. Dep. 21:5-12.

[9]      Pltf. Dep. 21:16-24.

[10]     Pltf. Dep. 53:25-54:4.

[11]     Pltf. Dep. 99:16-101:16; Declaration of Sandra Sandoval ("Sandoval Dec.") ¶ 3.

[12]     Pltf. Dep. 108:2-18; Sandoval Dec. ¶ 4.

[13]     Pltf. Dep. 109:1-7.

[14]     Pltf. Dep. 109:8-11.

[15]     Pltf. Dep. 113:17-114:8, 114:17-115:2.

level of seniority.[16]  The only criticisms Plaintiff recalls any managers ever giving her about her job performance were with regard to her productivity (i.e., sales numbers).[17]

### C. The Company Handbook, Code of Ethics, and Wells Fargo's Many Avenues to Lodge Workplace Complaints

Plaintiff was aware that Wells Fargo had a policy against harassment that included different avenues she could use to complain about harassment that included calling or emailing Employee Relations (Human Resources).[18]  Plaintiff had also long been aware of the existence of a company handbook and how to access the current version online.[19]  The handbook set forth various ways Plaintiff could complain if she had a workplace issue.[20]  Nonetheless, Plaintiff never contacted Employee Relations to complain about any harassment or misconduct by others.[21]  Plaintiff was also aware through her receipt of the Code of Ethics and taking annual Code of Ethics training that there was a Code of Ethics hotline she could call to report any improper conduct.[22]  Plaintiff never called the hotline.[23]

### D. Plaintiff Was Aware That Falsifying Documents Could Lead To Discharge

The Wells Fargo handbook contained a section about the types of violations that might lead to immediate discharge.[24]  Although Plaintiff did not know every example, she knew that certain kinds of violations of Wells Fargo policy could lead

---

[16]   Pltf. Dep. 114:14-16.

[17]   Pltf. Dep. 115:23-116:8, 117:3-22.

[18]   Pltf. Dep. 25:7-26:11, 27:12-25, 28:11-29:2.

[19]   Pltf. Dep. 37:9-15, 38:9-39:8; Ex. B-7.

[20]   Pltf. Dep. 39:9-25, 40:6-41:2.

[21]   Pltf. Dep. 28:8-10.

[22]   Pltf. Dep. 37:4-7, 37:21-38:8, 70:1-4, 70:13-17; Ex. B-6.

[23]   Pltf. Dep. 70:13-17.

[24]   Pltf. Dep. 62:5-15; Ex. B-7, p. 198.

to immediate discharge.[25]  The handbook stated that falsifying records could lead to immediate discharge.[26]  Plaintiff was aware falsifying records could lead to discharge because one of her former service managers was fired for falsification.[27] Plaintiff is unaware of anyone else Wells Fargo caught falsifying records who received lesser discipline.[28]  There is no evidence that Ms. Velasquez had treated other falsification incidents more leniently.[29]

### E.   Plaintiff Was Trained on the Importance of Witnessing The Signing of Loan Documents and the Signs of Elder Abuse

Separate from the Wells Fargo handbook and Code of Ethics, Plaintiff received online training on company policies and procedures throughout her employment with Wells Fargo.[30]  One training that Plaintiff completed in 2012 addressed risk and control topics relevant to this case.[31]  That training provided an illustrative example where a customer opening an account wanted to do so without signing the paperwork in the bank employee's presence, and the training told the employee that doing so was a forbidden practice.[32]  **Plaintiff understood from this training that she should not open an account without witnessing the account holder sign the documents.**[33]  Plaintiff undertook another training in January 2017 which presented two more hypotheticals that reaffirmed the need for her to see

---

[25]   Pltf. Dep. 63:10-64:3.

[26]   Pltf. Dep. 64:14-25.

[27]   Pltf. Dep. 65:1-66:21.

[28]   Pltf. Dep. 66:25-67:10.

[29]   Declaration of Pamela Velazquez ("Velazquez Dec.") ¶¶ 3, 9.

[30]   Pltf. Dep. 172:11-173:19; Ex. B-17.

[31]   Pltf. Dep. 174:1-12; Ex. B-18.

[32]   Pltf. Dep. 175:17-177:25; Ex. B-18, pp. 10-11.

[33]   Pltf. Dep. 178:1-5.

account holders actually sign the loan documents when opening accounts.[34]

Plaintiff also received training in 2016 on signs of possible financial abuse of older customers.[35]  One sign of abuse the training noted was where the older account holder was unable to answer questions about activity on the account.[36]  The training indicated that it was important to observe the older person to see if the customer understood what he or she was doing.[37]  The training identified a potential red flag when a younger person answered questions for the older account holder or prompted the account holder how to answer questions the bank posed.[38]

### F.    The May 25, 2017 Incident That Led to Plaintiff's Eventual Discharge

On May 25, 2017, Dr. Craig C came into the bank to complete forms to open some business lines of credit.[39]  Plaintiff knew Dr. C because he had come into the bank several times in the past.[40]  He sought to open two lines of credit for two separate LLCs, both of which had his elderly mother, Lorraine C, as the sole guarantor.[41]  Ms. C lived in a nursing home.[42]  Plaintiff had not seen Lorraine C since April 2017 and admits she never had any communications with Lorraine at any point beyond exchanging pleasantries such as saying "hello" and "how are

---

[34]    Pltf. Dep. 178:10-180:21, 181:4-182:11; Ex. B-19, pp. 5-8.

[35]    Pltf. Dep. 182:13-183:18; Ex. B-20.

[36]    Pltf. Dep. 184:9-186:9; Ex. B-20, p. 13-14.

[37]    Pltf. Dep. 186:10-23; Ex. B-20, p. 13-14.

[38]    Pltf. Dep. 188:1-189:8; Ex. B-20, pp. 15-16.

[39]    Pltf. Dep. 189:10-190:1, 190:21-24.

[40]    Pltf. Dep. 190:3-9.

[41]    Pltf. Dep. 218:4-15; Declaration of Evette Dominguez ("Dominguez Dec.") ¶¶ 5-6.

[42]    Pltf. Dep. 200:2-16, 252:14-253:12.

you."[43]  Plaintiff contends that she called Wells Fargo's business direct line to ask whether Dr. C could sign the forms, but business direct allegedly told her that Lorraine C had to sign the application.[44]  Plaintiff thus informed Dr. C that his mother had to sign the papers to open the account, but Dr. C asked if he could just bring the paperwork for his mother to sign, and then bring the signed document back into the branch.[45]

Plaintiff permitted Dr. C to take a paper application, leave the bank with it, and come back within 30 minutes with the document purportedly signed by Lorraine C.[46]  Plaintiff accepted the application despite failing to witness Lorraine C sign the document or even to confirm with Ms. C orally that she consented to open an account.[47]  For all Plaintiff knew, Dr. C could have obtained a signature from Lorraine C on false pretenses that she was signing something else entirely.

Part of the process of generating the paper application that Dr. C took out of the bank required Plaintiff to indicate in the computer whether the customer was present in the branch.[48]  In generating a paper application for Dr. C, Plaintiff falsely indicated on the computer that Lorraine C was actually present in the branch.[49]

Plaintiff understood that it normally was against the rules to have someone go and get a signature from an account holder outside the bank (because of the potential

---

[43]     Pltf. Dep. 197:13-198:2, 198:16-20, 200:2-19.

[44]     Pltf. Dep. 195:9-196-18.

[45]     Pltf. Dep. 202:22-203:22.

[46]     Pltf. Dep. 190:25-191:14.

[47]     Pltf. Dep. 191:8-14, 203:24-204:7.

[48]     Pltf. Dep. 191:16-193:6, 194:6-11; Declaration of Douglas Mylcraine ("Mylcraine Dec.") ¶¶ 2-4; Declaration of Rosalia Munoz ("Munoz Dec.") ¶ 4.

[49]     Mylcraine Dec. ¶¶ 2-4; Munoz Dec. ¶¶ 4-5.

1  for fraud or abuse).[50]  But Plaintiff testified that she knew and trusted Dr. C, so she

2  just assumed he had not obtained the signature in an improper way.[51]  Plaintiff

3  admitted, however, that she does not actually know how Dr. C obtained the

4  signature or whether Lorraine C was even aware what she was signing.[52]

5  **G.  Wells Fargo Learns of The May 25, 2017 Incident In September 2017 When the Credit Connections Department Called Ms. C Regarding the Account's Lack of Activity**

6

7         In September 2017, as customary when a business line of credit has no

8  activity for ninety days, an employee from Wells Fargo's Credit Connections

9  department, Anthony Martocci, called Lorraine C to discuss the lack of activity on

10  her two lines of credit and to attempt to confirm that she had authorized these lines

11  of credit.[53]  He specifically called Ms. C because she was the only guarantor listed

12  on both lines of credit.[54]  Mr. Martocci initially did not reach Ms. C, so he left her a

13  message, asking her to call him back.[55]

14         Subsequently, on September 6, 2017, Mr. Martocci received a call back from

15  a man identifying himself as Craig C.  The man explained that he was Ms. C's son

16  and was calling regarding the credit lines.[56]  Mr. Martocci told Craig C that he could

17  not speak to him about the accounts because Craig C was not listed as a guarantor

18  on either account, and that he could only speak to Lorraine C.[57]  Craig C then said

19

20

21  [50]    Pltf. Dep. 207:4-7.

22  [51]    Pltf. Dep. 202:7-10, 204:16-21

23  [52]    Pltf. Dep. 204:8-14.

24  [53]    Declaration of Anthony Martocci ("Martocci Dec.") ¶ 3.

25  [54]    Martocci Dec. ¶ 3.

26  [55]    Martocci Dec. ¶ 3.

27  [56]    Martocci Dec. ¶ 4.

28  [57]    Martocci Dec. ¶ 4.

Lorraine C was present and put her on the phone.[58]  Mr. Martocci reported that he thought Ms. C sounded disoriented and that she did not appear to understand what was going on or what Mr. Martocci was asking.  He also reported that he heard Craig C prompting her how to answer at least one question.[59]  Mr. Martocci recognized that this appeared similar to situations he had been trained about as possible elder abuse.[60]  As such, he referred the issue for further investigation of possible elder abuse to Wells Fargo's Research and Remediation team, and it was subsequently referred to Wells Fargo's corporate investigations department.[61]  Plaintiff's manager, Sandra Sandoval, had no knowledge of this incident, and had no role in reporting or investigating it.[62]

## H.    Wells Fargo Assigns a Corporate Investigator To Investigate the May 25, 2017 Incident

When the matter was referred to corporate investigations, it was assigned to investigator Evette Dominguez.[63]  Plaintiff had never met Ms. Dominguez before.[64]  Ms. Dominguez interviewed Plaintiff by telephone on January 17, 2018 about the May 25, 2017 incident.[65]  Ms. Dominguez prepared notes of the interview that Plaintiff admits are consistent with Plaintiff's limited recollection of the interview.[66]

Among the statements that Ms. Dominguez attributed to Plaintiff were that

---

[58]    Martocci Dec. ¶ 4.

[59]    Martocci Dec. ¶ 4.

[60]    Martocci Dec. ¶ 5.

[61]    Martocci Dec. ¶ 6; Dominguez Dec. ¶ 4.

[62]    Pltf. Dep. 233:15-24; Sandoval Dec. ¶¶ 8, 12-13.

[63]    Pltf. Dep. 214:5-7; Dominguez Dec. ¶ 4.

[64]    Pltf. Dep. 214:8-9; Dominguez Dec. ¶ 7.

[65]    Pltf. Dep. 214:18-215:19; 371:20-372:17.

[66]    Pltf. Dep. 248:16-22, 249:7-9, 249:21-262:23; Dominguez Dec. ¶ 7; Ex. C.

-10-

(1) Plaintiff knew Lorraine C lived in a care home in Covina; (2) Plaintiff gave the line of credit application to Dr. C to take to Lorraine C and bring back; (3) Plaintiff had stated that Dr. C could not sign the document but rather Lorraine C had to sign it ; (4) Plaintiff had not informed her manager of this C incident; and (5) Plaintiff was aware of the general rule against taking documents out of the bank to sign, but she made an exception because she knew Craig C despite not having the authority to do so.[67]

That same day, Plaintiff emailed a statement and a supplemental statement to Ms. Dominguez setting forth her version of what happened in the May 25, 2017 incident.[68]  In the statement she sent at 2:48 p.m., Plaintiff reiterated that only Dr. C (not Lorraine C) was in the branch when Dr. C presented the application purportedly signed by Lorraine C (a fact inconsistent with what Plaintiff input in the system).[69]

### I.   Based on the Investigator's Recommendation, Wells Fargo Terminates Plaintiff's Employment for Falsification of Documents

On January 22, 2018, Evette Dominguez shared her conclusions with Pamela Velazquez, the District Manager.[70]  Ms. Dominguez recommended that Plaintiff be terminated for falsification because Plaintiff submitted the applications based on a purported signature of Lorraine C that she did not see Ms. C write and without ever having spoken to Ms. C to confirm she consented to open the accounts.  Essentially, Plaintiff falsely confirmed that she obtained the necessary consent to open an account when Plaintiff had not actually done so.[71]  Ms. Velazquez agreed with the recommendation but indicated she wanted to consult with Employee Relations

---

[67]     Dominguez Dec. ¶ 8;  Ex. C.

[68]     Pltf. Dep. 213:19-214:4, 221:4-7; Exs. B-21 and B-22.

[69]     Ex. B-22.

[70]     Dominguez Dec. ¶¶ 10-11; Ex. C.

[71]     Dominguez Dec. ¶ 9; Ex. C.

1  before making a termination decision.[72]  After doing so, Ms. Velazquez went

2  forward and authorized the discharge of Plaintiff's employment.[73]  Plaintiff was

3  notified of her discharge on January 30, 2018.[74]  Plaintiff did not make use of Wells

4  Fargo's internal appeal process (described in the handbook) to appeal the discharge

5  decision.[75]

### J.    Plaintiff Has Only Speculation to Support Her View That Her Termination Was Motivated By Age Discrimination

6
7          Plaintiff testified that she believes the real reason for her termination was her

8  age and the fact that she planned to retire within five years.[76]  Plaintiff admits she

9  never discussed her retirement with anyone in management and nobody in

10  management ever made mentioned to her of her retirement.[77] Plaintiff also admits

11  that she had no defined benefit pension plan that she would qualify for by working

12  more years, but rather she just had a 401K.[78]

13          Plaintiff admits that she never heard any age related comments from Sandra

14  Sandoval, from Pamela Velasquez, or anyone involved in the decision to terminate

15  her employment.[79]  However, Plaintiff believes Wells Fargo management had

16  animus against her because of age because two *previous* branch managers, neither

17  of whom worked at her branch past 2015, allegedly made negative comments about

18
19  _____

20     [72]    Dominguez Dec. ¶ 12; Ex. C; Velazquez Dec. ¶ 5.

21     [73]    Velazquez Dec. ¶¶ 6-7.

22     [74]    Pltf. Dep. 170:14-15; 273:9-25; Ex. B-29; Velazquez Dec. ¶ 7;
    Sandoval Dec. ¶ 11.

23     [75]    Pltf. Dep. 46:1-20.

24     [76]    Pltf. Dep. 334:6-14, 335:11-22.

25     [77]    Pltf. Dep. 339:9-14, 341:5-10.

26     [78]    Pltf. Dep. 339:19-341:4.

27     [79]    Pltf. Dep. 346:3-16 (plaintiff's summary of all the reasons she believes

28  her age played a role in the termination decision).

-12-

"senior" employees who remained in the same job for too long.[80]  She also contends that in 2016, the assistant manager Yuki Wawa told her Yuki had overheard unidentified managers make negative comments about "seniors."[81]  There is no evidence that the individuals Ms. Wawa was allegedly referencing were involved in the decision to terminate Plaintiff.[82]

Plaintiff also observed that two managers, someone named Homa and someone named Maria, had been discharged in the distant past when they were near retirement age, but she does know why they were discharged or what the evidence was that led to their termination. [83]

Finally, Plaintiff observed that when more senior employees left, they were usually replaced by younger employees who earned less.  She speculates that this shows an intention to get rid of older workers although she has no knowledge of applicant pools or the reasons why any person was selected.[84]  However, other workers over 50 (e.g., Sandoval, Munoz, and Cherbak) continue to work at the Covina branch.[85]

### K.    Plaintiff Released Any Wage And Hour Claims She Had Arising On or Before November 8, 2017

Plaintiff participated as a class member in a class settlement for the matter Wells Fargo Wage & Hour Cases, JCCP No. 4821.[86]  All class members released all their wage and hour claims through November 8, 2017.[87]  Plaintiff received (and

---

[80]    Pltf. Dep. 335:9-336:16.

[81]    Pltf. Dep. 336:17-337:15.

[82]    Velazquez Dec. ¶ 8.

[83]    Pltf. Dep. 341:11-342:6, 343:16-22.

[84]    Pltf. Dep. 344:14-345:21, 345:24-346:1

[85]    Sandoval Dec. ¶ 4.

[86]    Pltf. Dep. 118:6-119:17; Ex. B-11 ¶ 2, 4.

[87]    Pltf. Dep. 118:6-119:17; Ex. B-11 ¶ 3.

-13-

cashed) her settlement checks as a settlement class member.[88]

**L.     Plaintiff Submitted a Boilerplate Letter to the LWDA Attempting to Exhaust Administrative Remedies for a PAGA Claim**

On December 12, 2018, Plaintiff's counsel submitted a letter to the LWDA in an apparent attempt to exhaust the administrative remedy necessary to file a PAGA action.[89]  The letter does not identify which "aggrieved employees" Plaintiff purports to represent and sets forth just boilerplate accusations that Wells Fargo violated various Labor Code provisions, including Sections 203, 204, 221, 223, 226, 226.2, .7, 510(a), 1174, 1194(a), 1197, and 2810.5 as to the undefined universe of "aggrieved employees."[90]  Notably, when Plaintiff was asked at deposition whether she had intended this letter to apply to all non-exempt employees in California she indicated she had no knowledge whether there were Labor Code issues beyond those she purportedly witnessed in her branch.[91]  The LWDA took no action on the matter in response to the letter.

**III.     LEGAL ARGUMENT**

**A.     Plaintiff's Sixth Cause of Action for Age Discrimination Fails as a Matter of Law Because She Lacks Evidence That Wells Fargo's Proffered Reason For Dismissing Her Was a Pretext for Age Discrimination**

To defeat summary judgment of her claim for age discrimination, Plaintiff must come forth with evidence that Wells Fargo's proffered reason for discharging her was a pretext for age discrimination.  *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 355-56 (2000).  Further, Plaintiff must present "***substantial*** responsive evidence" that Wells Fargo's reasons are pretextual.  *Martin v. Lockheed Missiles & Space Co., Inc.*, 29 Cal. App. 4th 1718, 1735 (1994) (emphasis added).  Speculation is not

---

[88]     Pltf. Dep. 118:6-119:7; Ex. B-11 ¶ 4-6.

[89]     Pltf. Dep. 279:18-280:13; Ex. B-32.

[90]     Ex. B-32.

[91]     Pltf. Dep. 279:24-280:13.

-14-

substantial evidence. *Id.* at 1735. "[A]n employer is entitled to summary judgment if. . . the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." *Guz*, 24 Cal.4th. at 361.

Here, Plaintiff admitted to the corporate investigator, Evette Dominguez, that she prepared for Dr. C a paper application for him to take out of the bank to be signed by Lorraine C, a woman Plaintiff knew was elderly and living in a care home.  Plaintiff also accepted the purported Lorraine C signature without even calling to see if Ms. C actually consented.  Plaintiff had been expressly trained ***not*** to do this and knew it was against policy, but she violated the policy because she personally trusted that Dr. C was acting honestly.  In generating the paper application for Dr. C to take out of the branch, Plaintiff falsely indicated that Lorraine C was present in the branch.  The company handbook expressly lists falsification of documents as a ground for potential termination.  Plaintiff further admits that one of her former supervisors was fired for falsifying a document.  Plaintiff has absolutely no evidence to suggest that anyone involved in the investigation of the C incident or the termination had any animus against her on account of age.  Accordingly, both the corporate investigator who recommended termination and the district manager who accepted the recommendation acted in good faith in concluding that Plaintiff had engaged in terminable misconduct.

Plaintiff has no evidence to suggest that the stated reason for her termination is pretextual.  As an initial matter, to the extent Plaintiff takes issue with Wells Fargo's investigation and argues that it should have conducted its investigation differently, that argument would be immaterial.  Plaintiff cannot demonstrate pretext by arguing that she is dissatisfied with Wells Fargo's decision or that Wells Fargo's decision was ultimately wrong.  Rather, it is well established that even where an employer makes a mistake in judgment, that is not evidence of pretext as a matter of law. *See Hersant v. Dept. of Soc. Servs.*, 57 Cal. App. 4th 997, 1005 (1997) (holding that it is not sufficient for a plaintiff to "simply show that the employer's

-15-

decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"); *see also Guz*, 24 Cal. 4th at 361 (employer's decision need not be wise or correct, as long as the reason for that decision is non-discriminatory); *King v. United Parcel Svc.*, 152 Cal. App. 4th 426, 436 (2007) ("It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case."); *Artega v. Brink's, Inc.*, 163 Cal. App. 4th 327, 341 (2008) (employer's reason "does not have to be a reason that the judge or jurors would act on or approve.").  Thus, Plaintiff's personal opinion that Wells Fargo should have chosen lesser discipline cannot save her claim.

At bottom, a corporate investigator who had never met Plaintiff and had no reason to have animus against her reported to management that plaintiff had admitted to facts that, if true, warranted her discharge, and management terminated her employment based on that representation.  On that basis, Wells Fargo is entitled to summary judgment on the age discrimination claim.

**B.    Plaintiff's Claim for Punitive Damages Fails as a Matter of Law Because She Lacks Admissible Evidence of Malicious, Oppressive or Fraudulent Misconduct by a Wells Fargo Officer, Director or Managing Agent**

To successfully oppose a motion for partial summary judgment of a punitive damages claim, the plaintiff must establish by clear and convincing evidence an act of oppression, fraud, or malice by an officer, director, or managing agent, which requires "despicable conduct" carried out in "conscious disregard" of the plaintiff's rights.  *See* Cal. Civ. Code § 3294(a); *Aquino v. Superior Court*, 21 Cal. App. 4th 847, 854-55 (1993); *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1119-20 (2001).  A finding of even unlawful discrimination in personnel decisions would not itself justify punitive damages as such conduct is not the equivalent of malice or oppression.  *See Ackerman v. Western Electric Co.*, 643 F. Supp. 836, 857 (N.D.

-16-

1   Cal. 1986), *aff'd*, 860 F. 2d 1514 (9th Cir. 1988) (discriminatory conduct that was

2   "unfounded, misguided and extremely ill-advised" insufficient).

3         Here, Plaintiff has no evidence that ***anyone*** at Wells Fargo engaged in an act

4   of "oppression, fraud, or malice" toward her.  Wells Fargo discharged Plaintiff

5   based upon its good faith belief from the statements of the corporate investigator

6   that Plaintiff admitted to conduct that was tantamount to knowingly allowing a

7   signature to be submitted on behalf of an elderly customer that she did not verify to

8   be accurate either by watching her sign the document or calling the customer to

9   obtain verbal consent.  Plaintiff concedes such conduct violates the handbook and

10  the Code of Ethics.  She has no evidence that anyone involved in the process of

11  discovering, investigating, or imposing discipline based upon the May 25, 2017

12  incident engaged in any conduct that could qualify as oppression, fraud, or malice.

13        Furthermore, to the extent Plaintiff assigns ill motives Anthony Martocci who

14  reported the suspected elder abuse or Evette Dominguez who investigated the

15  incident, these individuals do not even qualify as supervisors, and they have no role

16  in formulating Wells Fargo's corporate policy.[92]  Furthermore, Plaintiff has no

17  evidence that an officer, director, or managing agent engaged in or knowingly

18  ratified any such conduct.  *College Hospital Inc. v. Superior Court*, 8 Cal. 4th 704,

19  726 (1994)("Corporate ratification in the punitive damages context requires actual

20  knowledge of the conduct and its outrageous nature.").  Accordingly, regardless of

21  how the Court rules on Plaintiff's other claims, her claim for punitive damages must

22  be dismissed.

23      **C.**    **Plaintiff's Ninth Cause of Action Is Barred for Failure to Properly**
             **Exhaust the PAGA Administrative Remedy**

24

25        Before commencing a PAGA action, the PAGA plaintiff must give "written

26  notice . . . to the LWDA and the employer of the specific provision of this code

27  ───────────────

28      [92]    Martocci Dec. ¶ 1; Dominguez Dec. ¶ 1.

-17-

alleged to have been violated, ***including the facts and theories to support the alleged violation***." *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal. App. 4th 365, 376 (2005); Cal. Labor Code §2699.3(a) (emphasis added). PAGA's exhaustion requirements exist to allow the LWDA "to act first on more 'serious' violations such as wage and hour violations and give employers an opportunity to cure less serious violations." *Caliber Bodyworks*, 134 Cal. App. 4th at 375; *Ovieda*, 2013 WL 3887873, at *3 ("PAGA sets forth an administrative exhaustion requirement to give the LWDA the initial opportunity to investigate and cite employers for Labor Code violations"). Where the plaintiff fails to satisfy the PAGA's "prefiling notice and exhaustion requirements, [he is] not entitled to pursue . . ." a PAGA cause of action. *Caliber Bodyworks*, 134 Cal. App. 4th at 383.

The Ninth Circuit in *Alcantar v. Hobart Service, et al.*, 800 F.3d 1047 (9th Cir. 2015) upheld this Court's dismissal of a PAGA claim where the plaintiff's otherwise timely LWDA letter merely recited legal conclusions and cited various Labor Code statutes without setting forth facts and theories in sufficient detail to allow the employer or the LWDA a meaningful opportunity to investigate the facts behind a claim. The letter at issue in *Alcantar* stated the following:

> "Our offices have been retained by Joseluis Alcantara [sic] (Plaintiff). Plaintiff is a former employee of ITW Food Equipment Group, LLC aka Hobart Service (Defendant). Plaintiff contends that Defendant (1) failed to pay wages for all time worked; (2) failed to pay overtime wages for overtime worked; (3) failed to include the extra compensation required by California Labor Code section 1194 in the regular rate of pay when computing overtime compensation, thereby failing to pay Plaintiff and those who earned additional compensation for all overtime wages due; (4) failed to provide accurate wage statements to employees as required by California Labor Code section 226; (5) failed to provide reimbursement for work related expenses as required by Labor Code § 2802; and, (6) failed to provide off-duty meal periods and to pay compensation for work without off-duty meal periods to its California employees in violation of California Labor Code sections 226.7 and 512, and applicable Industrial

-18-

Welfare Commission orders. Said conduct, in addition to the forgoing, violated each Labor Code section as set forth in California Labor Code section 2699.5."

*Id.* at 1057.  The Ninth Circuit held that the plaintiff's letter was "insufficient" to exhaust his administrative remedies, thus dooming the PAGA claim:

"[T]he only facts or theories that could be read into this letter are those implied by the claimed violations of specific sections of the California Labor Code—that Hobart failed to pay wages for time worked, failed to pay overtime wages for overtime worked, failed to include the extra compensation required by §1194 in the regular rate of pay when computing overtime compensation, and so on.

***

Plaintiff's letter—a string of legal conclusions with no factual allegations or theories of liability to support them—is insufficient to allow the Labor and Workforce Development Agency to intelligently assess the seriousness of the alleged violations. Neither does it provide sufficient information to permit the employer to determine what policies or practices are being complained of so as to know whether to fold or fight."

*Id.*; *see also Gunn,* 2016 WL 7030363, at *4 (granting motion to dismiss PAGA claim based on similarly defective letter to LWDA); *Holak v. K Mart Corp.*, 2015 WL 2384895, at *3 (E.D. Cal. May 19, 2015) (superseded by statute on other grounds) (holding that plaintiff failed to exhaust PAGA claim for violation of Labor Code Section 226 because letter to LWDA "contained no facts or theories of liability [concerning this violation], only legal conclusions"); *Ovieda*, 2013 WL 3887873, at *10 (dismissing PAGA claim because the plaintiff's "notice contains no facts specific to Ovieda's principal meal and rest break claim and unpaid wages claim and no information about what Defendants' allegedly illegal policy and practices are"); *Sinohui v. CEC Entm't, Inc.*, 2016 WL 3406383, at *3 (C.D. Cal. June 14, 2016) (dismissing PAGA claim because "Sinohui's LWDA letter, like the letter at issue in *Alcantar*, provides nothing more than a 'series of legal

-19-

1   conclusions'").

2       Similarly here, Plaintiff's letter to the LWDA is vague and conclusory and

3   fails to set forth enough facts for the LWDA to evaluate it.  The letter does not even

4   define who is within the universe of "aggrieved employees" out of the **thousands** of

5   various Wells Fargo employees in California.  Although the letter sets forth a series

6   of legal conclusions that Wells Fargo allegedly violated Labor Code Sections 203,

7   204, 221, 223, 226, 226.2, .7, 510(a), 1174, 1194(a), 1197, and 2810.5, it states only

8   that the statutes were allegedly violated without explaining the theories in any detail.

9   The only theories it sets forth beyond bare legal conclusions are that employees (1)

10  were told not to record time before the start of their shifts or after the end of their

11  shifts; and (2) were instructed to work through breaks, which is just boilerplate.  The

12  failure to provide sufficient detail is fatal to the PAGA claims.  *See Chie v. Reed*

13  *Elsevier, Inc.*, 2011 WL 3879495, *4 (N.D. Cal. Sept. 2, 2011) (dismissing the

14  plaintiffs' PAGA claim because they failed to provide any description of the

15  aggrieved employees); *Machado v. M.A.T. & Sons Landscape, Inc.,* 2009 WL

16  2230788, at *8 (E.D. Cal. July 23, 2009) (finding that, since plaintiffs failed to

17  identify the "other current or former employees" who were aggrieved, they failed to

18  state a PAGA claim).

19      In sum, it is apparent that Plaintiff's counsel have just selected a Wells Fargo

20  employee and asserted as many PAGA claims as possible on behalf of an

21  unspecified universe of other "aggrieved employees."  That does not satisfy the

22  PAGA requirement to exhaust administrative remedies in a way that allows the

23  LWDA reasonably to determine whether to take on the complaint as its own or defer

24  prosecution of the matter to a private attorney general.  Accordingly, Wells Fargo is

25  entitled to summary judgment on that claim.

26      **D.   Plaintiff's First Through Fifth, Seventh and Eighth Causes of
         Action Are Barred to The Extent They Arise on or Before**

27      **November 8, 2017 Because She Released Them Through Her
         Participation in a Class Settlement**

28

-20-

A court approved release bars a subsequent action on any of the released claims. *See Villacres v. ABM Industries Inc.*, 189 Cal. App. 4th 562, 586-87 (2010). Here Plaintiff admits she fell within the settlement class in Wells Fargo Wage & Hour Cases, JCCP No. 4821, and that she received and cashed two settlement checks she received pursuant to that settlement.  That settlement agreement included a release of any wage and hour claims through an effective date of November 8, 2017, which would include Plaintiff's First through Fifth, Seventh and Eighth Causes of Action here.  Accordingly, Wells Fargo respectfully requests that the Court grant partial summary judgment to those claims insofar as they arise on or before November 8, 2017.

## IV.    CONCLUSION

Based on the foregoing, Wells Fargo respectfully requests that this Court grant its motion for partial summary judgment in its entirety, or as to all claims the Court agrees fail as a matter of law.

DATED:  September 9, 2019  SHEPPARD MULLIN RICHTER & HAMPTON LLP

By      */s/ Thomas Kaufman*
THOMAS R. KAUFMAN
Attorneys for Defendant
WELLS FARGO BANK, N.A.

-21-